IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FILED
DEC 14 2010
CLERK, U.S. DISTRICT COURT

PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY,

PLAINTIFF,

v.   CIVIL CASE NO. 2:09CV312

BLOCK ROOFING CORPORATION,
RONDA A. CHEWNING,

DEFENDANTS.

## OPINION AND ORDER

This is a declaratory judgment action concerning an insurance coverage dispute. On November 23, 2010, a hearing on the parties' competing motions for summary judgment was convened. At the conclusion of that hearing, for the reasons explained herein, the Court ruled from the bench and **GRANTED** partial summary judgment in favor of Defendant Block Roofing Corp. ("Block").

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2007, Block performed roofing work at Sentara Leigh Hospital ("Sentara Hospital" or the "Premises") in Norfolk, Virginia. The roofing work began in the first quarter of 2007, lasted approximately four months, and involved the application of one or more adhesives, sealants, chemicals, and materials to Sentara Hospital's roof. Defendant Rhonda A. Chewning ("Chewning") was employed as a medical assistant at Sentara Hospital during the time Block worked on the hospital's roof.

1

In December 2008, Chewning filed a lawsuit in state court against Defendants Block and T.R. Driscoll, Inc.[1] Doc. 1. In her lawsuit (the "Underlying Action"), Chewning alleged that she suffered injuries from being exposed to harmful vapors inside Sentara Hospital and that Block was liable for those injuries because the harmful vapors were present as a result of Block's work on the hospital's roof. Id.

Before doing its roofing work, Block obtained insurance contracts issued by Plaintiff Pennsylvania National Mutual Casualty Insurance Co. ("Penn National"): Penn National issued to Block a commercial lines insurance contract (the "CGL Contract") for the contract period April 1, 2006 to April 1, 2007 and a commercial umbrella liability insurance contract (the "Umbrella Contract") for the contract period April 1, 2006 to April 1, 2007 (collectively, the "Insurance Contracts"). After being named in Chewning's lawsuit, Block requested defense and indemnity benefits from Penn National pursuant to those contracts. Doc. 12 at 2; Doc. 14 at 2; Doc. 18 at 2. Penn National, in turn, reserved its rights under the contracts, citing the "pollution exclusion" language therein. Doc. 1.

On July 6, 2009, Penn National filed a complaint seeking declaratory judgment that the pollution exclusions in the Insurance Contracts removed any and all obligation on the part of Penn National to defend or indemnify Block in connection with the Underlying Action. Doc. 1. On January 29, 2010, the Court granted Penn National's motion to stay this litigation based on Chewning's nonsuit of the Underlying Action, Doc. 26, and stayed this matter until thirty (30) days after Chewning re-filed her claims in state court or until May 30, 2010, whichever was earlier. Doc. 39 at 6. On June 1, 2010, Plaintiff gave notice that the Underlying Action was

---

[1] On June 10, 2010, the parties to this action stipulated to the dismissal of Defendant T.R. Driscoll, Inc., and T.R. Driscoll, Inc. was dismissed that day.

2

refiled on May 17, 2010. Doc. 40. On June 8, 2010, the Court ordered the stay in this case lifted. Doc. 41.

On October 20, 2010, Penn National moved for summary judgment. Doc. 55. Block responded on November 1, 2010. Doc. 71. Penn National filed a reply to that response on November 3, 2010. Doc. 79. Block moved for summary judgment on November 1, 2010, Doc. 72, Penn National responded on November 9, 2010, Doc. 81, and Block filed its reply on November 12, 2010, Doc. 84. A hearing was convened on November 23, 2010.

## II. LEGAL STANDARDS

The procedural aspects of summary judgment in this case are determined by federal law. Pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), entry of summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Virginia law governs the substantive aspects of this case. The forum state's choice-of-law rules apply in a federal diversity jurisdiction case, and "Virginia's choice-of-law rules dictate that 'generally, the law of the place where an insurance contract is written and delivered controls issues as to coverage.'" Capitol Environmental Servs., Inc. v. North River Ins. Co., 536 F. Supp.

2d 633, 639 (E.D. Va. 2008) (quoting Buchanon v. Doe, 431 S.E.2d 289, 291 (Va. 1993)). "'Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured.'" Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 419 (4th Cir. 2004)). Here, there is no dispute that the Insurance Contracts were delivered to Block at its Norfolk, Virginia office.

The governing rule in Virginia concerning an insurer's duty to defend its insured is that such a duty depends on whether the allegations made in the complaint—here, Chewning's Underlying Action—potentially fall within the policy's coverage. Capitol Environmental Servs., Inc., 536 F. Supp. 2d at 639 (citing VEPCA v. Northbrook Property & Cas. Ins., 475 S.E.2d 264, 265 (Va. 1996) (quoting Lerner v. Safeco, 245 S.E.2d 249, 251 (Va. 1978) (stating that the duty to defend "arises whenever the complaint [against the insured] alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy")). This governing rule is termed the Eight Corners Rule, and it "requires a court to compare the four corners of the insurance policy against the four corners of the underlying complaint; if any allegations may potentially be covered by the policy, the insurer has a duty to defend." Id. at 640 (citing American Online, Inc. v. St. Paul Mercury Ins. Co., 207 F. Supp. 2d 459, 465 (E.D. Va. 2002)).

> The Eight Corners Rule is a combination of the Exclusive Pleading Rule, under which "an insurer's duty to defend is determined solely by the claims asserted in the pleadings" and the Potentiality Rule, under which "an insurer's duty to defend is triggered if there is any 'potentiality' that the allegations in the pleadings could state a claim that would be covered by the policy."

Id. at 640 n.14 (quoting Solers, Inc. v. Hartford Cas. Ins. Co., 146 F. Supp. 2d 785, 791 (E.D.Va.2001)).

4

In insurance contract disputes, the insured bears an initial burden to establish a *prima facie* case that coverage should be triggered—the insured must "bring himself within the policy." TRAVCO Ins. Co. v. Ward, 715 F. Supp. 2d 699, 706 (E.D. Va. 2010) (quoting Maryland Cas. Co. v. Cole, 158 S.E. 873, 876 (Va. 1931)). "Yet this burden is not especially onerous since the insurer must defend unless it clearly appears from the initial pleading the insurer would not be liable under the policy contract for *any* judgment based upon the allegations." Res. Bankshares Corp., 407 F.3d at 636 (internal quotations and citations omitted). If an insured carries its initial burden, the burden shifts to the insurer to prove its affirmative defenses, including the application of any policy exclusions. See TRAVCO Ins. Co., 715 F. Supp. 2d at 706 ("'[T]he burden is upon the insurer to prove that an exclusion applies.'") (quoting Allstate Ins. Co. v. Gauthier, 641 S.E.2d 101, 104 (2001)).

When the language of an insurance policy is clear and unambiguous, courts must give the language its plain and ordinary meaning and enforce the policy as written. Transcontinental Ins. Co. v. RBMW, Inc., 262 Va. 502, 512, 551 (Va. 2001); Schneider v. Continental Cas. Co., 989 F.2d 728, 733 (4th Cir. 1993). "[I]t is not a court's function to make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer." Fed. Ins. Co. v. New Coal Co., 415 F. Supp. 2d 647, 651 (W.D. Va. 2006) (citing Blue Cross & Blue Shield v. Keller, 248 Va. 618 (Va. 1994)) (internal quotations omitted). "If, on the other hand, the contract is found to be lacking in clarity, the 'court should resort to parol evidence to ascertain the true intention of the parties.'" TRAVCO Ins. Co., 715 F. Supp. 2d at 707 (quoting Aetna Cos. & Sur. Co. v. The Fireguard Corp., 455 S.E.2d 299, 232 (Va. 1995)).

"The question of whether a writing is ambiguous is a question of law" for the Court. Riverton Investment Corp. v. United States, 170 F. Supp. 2d 608, 613 (W.D. Va. 2001) (citing

5

Tuomala v. Regent Univ., 252 Va. 368 (1996)). "A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C., 557 S.E.2d 199, 200 (Va. 2002). The Court may not strain to find ambiguities, and a policy provision is ambiguous only when, in context, it is capable of more than one reasonable meaning. Res. Bankshares Corp., 407 F.3d at 636. Further, if an ambiguity exists, it must be construed against the insurer. See id. (citing Craig v. Dye, 526 S.E. 2d 9 (Va. 2000); Caldwell v. Transp. Ins. Co., 364 S.E. 2d 1, 3 (Va. 1988); Ocean Accident & Guar. Corp. v. Washington Brick & Terra Cotta Co., 139 S.E. 513, 517 (Va. 1927) ("It is a well recognized rule that insurance policies, in case of doubt, should be construed most strongly against the insurer. But this does not authorize the court to make a new contract for the parties, nor to adopt a construction not justified by the language or intent of the parties.")).

Finally, it must be noted that "[a] matter admitted under [Federal Rule of Civil Procedure 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FED. R. CIV. P. 36(b). That said, "the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits," FED R. CIV. P. 36(b), and the Court may do so subject solely to Rule 16(e)'s mandate that courts modify final pretrial orders only to prevent manifest injustice. FED. R. CIV. P. 16(e) and 36(b).

### III. THE INSURANCE CONTRACTS

The CGL Contract contains the following provisions concerning coverage:

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance

6

applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply . . . .

    b. This insurance applies to "bodily injury" and "property damage" only if:

        (1) The bodily injury or property damage is caused by an "occurrence" that takes place in the "coverage territory" . . .

The CGL Contract contains the following provisions concerning exclusions to coverage and exceptions to those exclusions:

2. Exclusions

    This insurance does not apply to:

    . . .

    f. Pollution

        (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

        . . .

        (d) At or from any premises, site or location on which any insured . . . are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

        . . .

        (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; . . .[2]

---

[2] The CGL Contract contains the following definitions:
    1.   "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
    . . .
    13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
    . . .
    15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

7

The Umbrella Contract contains the following provisions concerning exclusions to coverage:

> 2. Exclusions
>
> This insurance does not apply to:
> . . .
> i. Pollution
>
>> (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; . . .

The Umbrella Contract does not contain an exception to its pollution exclusion. The Umbrella Contract's and the CGL Contract's definitions of "pollutants" are identical.

## IV. DISCUSSION

Block paints Penn National's declaratory judgment action as a baseless attempt by Penn National to avoid its duty to defend and indemnify Block. Doc. 73. Block asserts that an examination of the Insurance Contracts and the Underlying Action makes it "perfectly clear" that Penn National's coverage obligations have been triggered. Id. Penn National argues that, based on Chewning's allegations in the Underlying Action, it has no duty to defend or indemnify Block because (a) the Insurance Contracts are unambiguous, (b) the Insurance Contracts' respective "pollution exclusions" apply, and (c) the CGL Contract's exception to the "pollution exclusion" does not apply. Doc. 56.

### A. THE CGL CONTRACT

#### 1. PENN NATIONAL'S DUTY TO DEFEND

The CGL Contract's exception to the pollution exclusion (the "Exception") provides that the contract's "pollution exclusion" does not apply to "'Bodily injury' or 'property damage' sustained within a building and caused by the release of gases, fumes or vapors from materials

8

brought into that building in connection with operations being performed by you . . . ." Penn National contends that it has no duty to defend or indemnify Block because Chewning never alleged in the Underlying Action that Block brought materials *inside* Sentara Hospital. Penn National maintains that the phrase "brought into that building" in the Exception qualifies "materials" such that coverage would have been triggered in this case only if Chewning alleged injuries caused by fumes originating from materials that Block brought into—meaning inside— Sentara Hospital. In Penn National's view, the central issue is whether Block brought materials into *the interior* of Sentara Hospital.

The Court is not persuaded by Penn National's interpretation of the Exception. First, the Court finds that the Exception unambiguously triggers coverage in this case. Second, if the Court chose to recognize Penn National's forced interpretation of the Exception as a viable alternative interpretation, the existence of more than one reasonable meaning for the Exception indicates ambiguity, and any ambiguity must be construed against Penn National. Third, even if the Court accepted Penn National's interpretation of the Exception in whole, as the unambiguously proper interpretation, Block is still entitled to partial summary judgment.

The Exception unambiguously affords Block coverage in this case. Block brought materials *into* Sentara Hospital. The roof of a building is part of the building. Therefore, when a contractor applies materials to, or incorporates materials into, a building's roof, that contractor necessarily brings materials *into* that building. Accordingly, through its work on Sentara Hospital's roof, Block necessarily brought adhesives, sealants, chemicals and materials *into* Sentara Hospital. For this reason, under the Eight Corners Rule, Block is entitled to partial summary judgment that Penn National has a duty to defend it in the Underlying Action on the CGL Contract: Chewning's complaint in the Underlying Action alleged injuries resulting from

fumes from materials Block brought into Sentara Hospital, and the Exception affords coverage for bodily injury caused by the release of fumes from materials brought into a building.

At this juncture, the Court could conclude its analysis of whether Penn National has a duty to defend Block in the Underlying Action. However, Block would be entitled to summary judgment that Penn National has such a duty to defend even if the Court were to either (1) recognize Penn National's strained interpretation of the Exception as a viable alternative interpretation, or (2) accept that interpretation as *the* unambiguously correct interpretation of the Exception.

As explained *supra*, an insurance policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning, and, if an ambiguity exists, it must be construed against the insurer. Therefore, if the Exception was subject to either the Court's or Penn National's interpretations, the existence of more than one "reasonable" meaning would indicate ambiguity, and in the face of such ambiguity, the Court must construe the Exception against Penn National, in favor of coverage. It follows that Block would be entitled to have Penn National defend it in the Underlying Action even if the Court chose to recognize Penn National's interpretation of the Exception as a reasonable interpretation.

Thirdly, even assuming *arguendo* that Penn National's interpretation is unambiguously correct, Block is still entitled to partial summary judgment that Penn National has a duty to defend it in the Underlying Action. Again as explained *supra*, whether Penn National has a duty to defend Block is determined by the Eight Corners Rule, which "is a combination of the Exclusive Pleading Rule, under which 'an insurer's duty to defend is determined solely by the claims asserted in the pleadings' and the Potentiality Rule, under which 'an insurer's duty to defend is triggered if there is any 'potentiality' that the allegations in the pleadings could state a

claim that would be covered by the policy.'" Capitol Environmental Servs., Inc. v. North River Ins. Co., 536 F. Supp. 2d 633, 640 n.14 (E.D. Va. 2008) (quoting Solers, Inc. v. Hartford Cas. Ins. Co., 146 F. Supp. 2d 785, 791 (E.D. Va.2001)).

Chewning's complaint makes no mention of roofing materials being brought *inside* Sentara Hospital, and Chewning alleges that Block's roofing work "was begun *on the roof* in early 2007." Doc. 71, Ex. 4 (emphasis added). However, Chewning's use of the "on the roof" language in her complaint does not eliminate *the potential* that her claims could be covered by the CGL Contract. As Block contends:

> Ms. Chewning **may** put on evidence that the vapors or fumes to which she was allegedly exposed came from materials used in the repair job performed on a roof drain located inside the building damaged during the course of Block Roofing's work on the roof. Similarly, Ms. Chewning **may** put on evidence that the vapors or fumes emanated from materials that were brought into the hospital building by Block Roofing workers who frequently passed by her work station. Likewise, Ms. Chewning **may** put on evidence that adhesives from the roofing project dripped down into the hospital building and subsequently released vapors and fumes that were transported to her work area via the ventilation system. . . . [I]f proved at trial, any of the above scenarios would directly implicate the Exception, thus necessitating coverage.[3]

Doc. 73. at 11 (emphases in original). Accordingly, even under Penn National's interpretation of the Exception, the allegations in Chewning's complaint could state a claim that would be covered by the CGL Contract. Penn National's assertions to the contrary are premised on a constrained application of the Eight Corners Rule that ignores the rule's Potentiality component and invokes only the rule's Exclusive Pleading component. For these reasons, even under Penn National's interpretation of the Exception that requires materials to have been delivered *inside* Sentara Hospital, Block is entitled to summary judgment that Penn National has a duty to defend Block in the Underlying Action.

---

[3] See *infra* Section IV.C, where the Court rules upon Block's discovery responses.

11

### 2. PENN NATIONAL'S DUTY TO INDEMNIFY

Penn National asserts that even if the Court finds that Penn National has a duty to defend Block, Penn National has no duty to indemnify Block.

The duty to defend is broader than the duty to indemnify. See Capitol Environmental Servs., Inc. v. North River Ins. Co., 536 F. Supp. 2d 633, 640 (E.D. Va. 2008) ("[T]he duty to defend turns on a complaint's allegations whereas the duty to indemnify requires established or litigated facts."). "Unlike the duty to defend, which is resolved solely by examining the insurance policy and third-party complaint's allegations, 'a duty to indemnify springs from the facts actually discovered or proven at trial.'" Id. at 645 (quoting Morrow Corp. v. Harleysville Mut. Ins. Co., 101 F. Supp. 2d 422, 435 (E.D. Va. 2000)) (other citations omitted). For this reason, despite the fact that the Court cannot currently envision a scenario in which Block is liable to Chewning but Penn National has no duty to indemnify Block, only after the state court has made its decision will this Court be able to evaluate whether or not Penn National has a duty to indemnify Block.

### B. THE UMBRELLA CONTRACT

The Umbrella Contract does not contain an exception to its pollution exclusion. Penn National therefore contends, "[I]rrespective of whether the Court determines that an exception to the CGL Contract's 'pollution exclusion' might apply, the Umbrella Contract's 'pollution exclusion' plainly bars coverage in connection with the Underlying Action: under that contract, there is no exception for roofing materials brought inside a building." Doc. 81 at 15. At the November 23, 2010 hearing, the Court decided to withhold judgment on the issues surrounding the Umbrella contract for the following reasons: First, the Court found that Penn National had a duty to defend Block under the CGL Contract, and the Umbrella Contract therefore need only be

addressed should Block be found liable to Chewning for some amount of damages exceeding the indemnification limits of the CGL contract. Second, the parties never indicated whether the Umbrella Contract incorporates the CGL Contract in full or in part. Third, assuming that the Umbrella Contract incorporates some or all of the CGL Contract, the parties never addressed whether the absence of an exception to the Umbrella Contract's pollution exclusion controls, or whether that absence is trumped by an Umbrella Contract provision incorporating the CGL Contract and its concomitant coverage obligations.[4]

## C. BLOCK'S SUPPLEMENTAL DISCOVERY RESPONSES

Before concluding, the Court must address one final issue in this case. Penn National based much of its argument for summary judgment on what it characterized as Block's repeated admissions. See e.g., Doc. 56 at 26 ("Block has admitted, repeatedly, that it conveyed the roofing materials it used in the project directly to the Premises' rooftop via forklift, and that it did not bring any of those materials inside the Premises"). On July 19, 2010, Block served responses to Penn National's first request for admissions.[5] Doc. 55-1, Ex. C. On September 2, 2010, Block served supplemental amended responses to Penn National's first request for admissions and supplemental answers to Penn National's first set of interrogatories.[6] Doc. 71,

---

[4] The Court has not considered evidence that the CGL and Umbrella contracts were marketed directly to the roofing industry and evidence that Penn National accepted coverage in other similar occurrences where roofers were, like Block, performing roofing work in their usual and ordinary manner, utilizing their usual and ordinary materials. Such evidence is extrinsic and would only be considered if the Court found a latent ambiguity in the Insurance Contracts.

[5] In its July 19, 2010 responses, Block admitted (1) that it performed work at Sentara Hospital in 2007; (2) that such work involved the application of adhesives, sealants, chemicals, and other materials to the Sentara Hospital roof; (3) that "it did not personally carry adhesives inside the premises;" (4) that "it did not personally carry sealants inside the premises;" (5) that "it did not personally carry any chemicals other than adhesives and/or sealants inside the premises;" (6) that "it did not personally carry materials inside the premises;" and (7) that it conveyed all adhesives, sealants, chemicals, and other materials "directly to the premises' roof." Doc. 55-1, Ex. C.

[6] In its amended responses to Penn National's request for admissions, Block *denied* that it did not bring any adhesives, sealants, chemicals, and other materials into Sentara Hospital, and, with regard to the direct conveyance of adhesives to the hospital's roof, Block stated, "Block roofing admits that the majority of adhesives used in the project were conveyed directly to the premises' roof via a forklift; however, Block denies as untrue the implication that adhesives were not otherwise brought into the building." Doc. 71, Ex. A.

13

Exs. A and B. Penn National insists that because a "judicial admission is usually treated as absolutely binding," Block is bound by its initial admissions. Doc. 79 at 14 (citing New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963)).

Under Federal Rule of Civil Procedure 36, a Court's decision of whether to allow withdrawal or amendment of an admission involves balancing the interests of the movant in presenting his case on the merits and the prejudice to the opposing party in relying on the admission.[7] McClanahan v. Aetna Life Ins. Co., 144 F.R.D. 316, 320 (W.D. Va. 1991). At the November 23, 2010 hearing, the Court found that Penn National would suffer no prejudice if the Court considered Block's supplemental amended discovery responses.[8] The Court therefore **GRANTED** Block's motion to amend its initial discovery responses. The Court notes, however, that its decision to allow Block's supplemental discovery responses is separate and distinct from its decision to grant partial summary judgment in favor of Block. As explained above, the Court's decision to grant partial summary judgment for Block rested upon the Court's interpretation of the CGL Contract's exception to the pollution exclusion and upon the Court's analysis under the Eight Corners Rule. The Court addresses Block's supplemental discovery responses here to facilitate the presentation of the merits of this case in any future proceedings.[9]

---

[7] In McClanahan v. Aetna Life Ins. Co., the court explained:
> The decision to allow a party to withdraw its admission is quintessentially an equitable one, balancing the rights to a full trial on the merits, including the presentation of *all* relevant evidence, with the necessity of justified reliance by parties on pre-trial procedures and finality as to issues deemed no longer in dispute. In a proper case, when an admission is made inadvertently, or new evidence is discovered after the admission despite due diligence, Rule 36(b) withdrawal should be allowed.

144 F.R.D. 316, 320 (W.D. Va. 1992).

[8] Penn National did not indicate that it forewent any potential discovery in reliance on Block's initial admissions. Further, Block served Penn National with its supplemental responses on September 2, 2010, twenty-six (26) days before Penn National's September 28, 2010 discovery deadline, and Penn National did not depose Block's president or Block's roofing project superintendent until September 22, 2010. As Block convincingly argued, "Penn National was well aware of Block Roofing's factual assertions and had every opportunity to explore the details far in advance of its discovery deadline." Doc. 84.

[9] Additionally, the Court notes that because it has allowed Block to amend its discovery responses, there is a genuine issue of material fact concerning whether Block's roofing materials were in fact brought *inside* Sentara Hospital.

## V. CONCLUSION

For the above reasons, the Court **GRANTED IN PART** Block's motion for summary judgment, Doc. 72; the Court granted Block summary judgment that Penn National has a duty to defend it in the Underlying Action. The Court also **DENIED IN PART** Penn National's motion for summary judgment, Doc. 55; the Court denied Penn National summary judgment that it has no duty to defend Block. Additionally, the Court **GRANTED** Block's motion to amend its initial discovery responses.[10]

The Court administratively **CLOSED** the remainder of the case pending resolution of the underlying tort action. The parties are **DIRECTED** to contact the Court within thirty (30) days following resolution of the underlying tort action, and the Court retains jurisdiction to decide any remaining issues at that time.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
December 10, 2010

---

This genuine issue would preclude summary judgment for Penn National even if the Court chose to accept Penn National's interpretation of the Exception as unambiguously correct.

[10] Block's formal motion to amend its initial discovery responses is found in Block's reply to Penn National's response to Block's motion for summary judgment. Doc. 84.